IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CHAMELEON, LLC, *et al.*, ) <br> ) <br> Defendants. ) | Civil Action No. 3:23-cv-763–HEH |

**MEMORANDUM OPINION**
**(Granting Defendants' Motion to Dismiss)**

THIS MATTER is before the Court on a Motion to Dismiss ("the Motion," ECF No. 11) filed by Defendants Chameleon, LLC ("Chameleon") and Gary V. Layne ("Layne") (collectively "Defendants") on February 20, 2024. Defendants move to dismiss the United States' Complaint (ECF No. 1) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. at 1; Mem. in Supp. at 1, ECF No. 12.) The parties have filed memoranda supporting their respective positions, and the Court heard oral argument on April 4, 2024. For the reasons that follow, the Court will grant Defendants' Motion.

## I. BACKGROUND

Defendant Chameleon is a limited liability corporation and its principal place of business is in Beaverdam, Virginia. (Compl. ¶ 8.) Defendant Layne is Chameleon's sole officer and registered agent. (*Id.*) The land in question is a parcel of real property located in Ashland, Virginia (the "Site") that Chameleon purchased on October 17, 2018.

(*Id.* ¶¶ 24, 26.) The Site comprises approximately 101.66 contiguous acres and was forested and undeveloped prior to 2019. (*Id.* ¶¶ 25–26.) Defendants began earthmoving activities in early 2019 and continued until at least August 2021. (*Id.* ¶ 44.) The United States alleges that the Site contains twenty-one (21) acres of wetlands which Defendants' earthmoving activities have affected. (*Id.* ¶ 28.) These wetlands are divided into three (3) zones: A, B, and C, and the United States describes them as follows. (*Id.* ¶¶ 30–43.)

### A. The Site

#### 1. Wetland A

Wetland A is "[t]he main north-south wetland complex on the Site" and has a "continuous surface connection to an unnamed tributary within the Site." (*Id.* ¶ 30.) The unnamed tributary is "relatively permanent" and connects with Lickinghole Creek. (*Id.* ¶ 31.) Lickinghole Creek, in turn, connects to the Chickahominy River, which is a "traditional navigable water." (*Id.* ¶ 31.) Lickinghole Creek is also a "relatively permanent" tributary of Stony Run, which is a "relatively permanent" tributary of the Chickahominy River. (*Id.* ¶ 33.) Both the unnamed tributary and Lickinghole Creek are mapped by the United States Geologic Survey ("USGS") in its StreamStats online mapping application. (*Id.* ¶ 32.)

#### 2. Wetland B

Wetland B is "the eastern wetland complex on the Site" and has a "continuous surface connection" to a "relatively permanent unnamed tributary to Campbell Creek on the eastern edge of the Site." (*Id.* ¶ 34.) This unnamed tributary also connects to the Pamunkey River, a "traditional navigable water." (*Id.* ¶ 35.) Campbell Creek is a

2

"relatively permanent" tributary of Machumps Creek, which itself is a "relatively permanent" tributary of the Pamunkey River. (*Id.* ¶ 36.) Both the unnamed tributary and Campbell Creek are mapped in the USGS' StreamStats online mapping application. (*Id.* ¶ 35.)

### 3. Wetland C

Wetland C is the "southern wetland complex" and is "located in the drainage area of multiple relatively permanent unnamed tributaries." (*Id.* ¶ 37.) Wetland C has a "continuous surface connection to a relatively permanent unnamed tributary to the unnamed tributary to Lickinghole Creek" as mentioned in the description of Wetland A. (*Id.* ¶ 38.) Wetland C also has a "continuous surface connection to an unnamed relatively permanent tributary to the unnamed tributary to Campbell Creek," mentioned in the description of Wetland B. (*Id.* ¶ 40.)

### B. The Government's Investigation

Around April 3, 2019, the Virginia Department of Environmental Quality ("VADEQ") learned that clearing and grubbing activities were potentially occurring at the Site and impacting wetlands. (*Id.* ¶ 49.) On May 10, 2019, Defendant Layne denied VADEQ personnel access to the Site, requiring VADEQ to execute an inspection warrant. (*Id.* ¶¶ 50–51.) Defendants began new timber harvesting and earthmoving activities on the Site in the Fall of 2019 and VADEQ issued a Notice of Violation. (*Id.* ¶¶ 51–53.)

In early 2020, the Southern Virginia Regulatory Section of the Army Corps of Engineers ("the Corps") issued letters to Defendants requesting information about the

3

impacts to the Site's wetlands. (*Id.* ¶ 54.) The Corps referred the matter to the U.S. Environmental Protection Agency ("EPA") after Defendants did not respond. (*Id.* ¶ 55.) The EPA then sent a letter to Defendants with a Request for Information, to which Layne responded that Defendants did not violate the Clean Water Act ("CWA"). (*Id.* ¶¶ 56–57.) The EPA sent another letter reiterating the Request for Information and requesting access to the Site for an inspection. (*Id.* ¶ 58.) Layne then spoke with an EPA supervisor via telephone and refused to grant the EPA access to the Site. (*Id.* ¶ 59.) Layne rebuffed all the EPA's subsequent attempts to communicate with him. (*Id.* ¶¶ 60–61.)

The EPA served an administrative warrant on Defendants and inspected the Site in April 2021. (*Id.* ¶¶ 62–63.) It concluded that Defendants had impacted twenty-one (21) acres of wetlands at the Site and, rather than taking corrective action or mitigating the impacts of their unpermitted discharge, continued to engage in earthmoving activities. (*Id.* ¶¶ 64–67.) Defendants' use of heavy machinery to move earth on the Site caused pollutants, in the form of dirt, spoil, rock, and sand, to be discharged into twenty-one (21) acres of the Site's wetlands. (*Id.* ¶¶ 44–47.) Defendants did not obtain a Corps permit before making such discharges, as is required by the CWA. (*Id.* ¶ 48.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A Rule 12(b)(1) motion challenges the Court's jurisdiction over the subject matter of a complaint. Such a challenge can be facial, asserting that the facts as pled fail to establish jurisdiction, or factual, disputing the pleadings themselves and arguing that other facts demonstrate that no jurisdiction exists. *Beck v. McDonald*, 848 F.3d 262, 270

4

(4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). For a facial challenge, "the plaintiff is 'afforded the same procedural protection as [it] would receive under a Rule 12(b)(6) consideration.'" *Id.* (quoting *Kerns*, 585 F.3d at 192). However, when a party brings a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply." *Id.* (citing *Kerns*, 585 F.3d at 192).

**B. Rule 12(b)(6)**

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)) (internal quotations omitted). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey*, 706 F.3d at 387) (alteration in original). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678).

A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering such

5

a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted). A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." *Id.* (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (internal quotations omitted) (alteration in original).

## III. DISCUSSION

Defendants move to dismiss the sole Count found within the United States' Complaint, pursuant to Rules 12(b)(1) and 12(b)(6). (Mem. in Supp. at 1.) Defendants bring a facial challenge to jurisdiction and argue that there is no CWA jurisdiction and, thus, no federal jurisdiction. (*Id.* at 1, 4.) They also argue that the United States has failed to plead sufficient factual allegations to support its claim. (*Id.* at 1.)

The CWA regulates the discharge of pollutants into "navigable waters." 33 U.S.C. §§ 1311, 1344. The statute defines "navigable waters" as "waters of the United States, including the territorial seas" ("WOTUS"). 33 U.S.C. § 1362(7). The Supreme Court

6

has held that WOTUS "include[] only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (internal quotations and citation omitted) (alterations omitted). In *Sackett v. EPA*, 598 U.S. 651 (2023), the Supreme Court clarified that WOTUS includes traditional navigable waters, "relatively permanent" tributaries of such waters, and wetlands that are indistinguishable from such waters. *Id.* at 678–79 (citing *Rapanos*, 547 U.S. at 742).

For a particular wetland or other body of water to be subject to CWA jurisdiction, it must fall within the bounds of the two-part test initially established by the four-Justice plurality in *Rapanos* and subsequently adopted in *Sackett*. This test establishes whether the wetlands are "indistinguishable" from WOTUS. 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 755). First, the wetland must be adjacent to another body of water which independently qualifies as WOTUS, and, second, it must have a "continuous surface connection" with the established WOTUS, such that it is "difficult to determine where the 'water' ends and the 'wetland begins.'" *Id.* at 678–79 (citing *Rapanos*, 547 U.S. at 755). The *Sackett* Court rejected the test proposed in Justice Kennedy's *Rapanos* concurrence, which required only a significant nexus between a property's wetland and adjacent navigable waters. *Id.* at 679–83.

### A. The Court has subject matter jurisdiction to hear this case.

Defendants urge this Court to dismiss the United States' claim under Rule 12(b)(1) because the wetlands on the Site do not fall under the jurisdiction of the CWA. (Mem. in

7

Supp. at 19.) Defendants argue that, in order for this Court to have jurisdiction over the United States' claim, the United States must establish that the wetlands in question fall under CWA jurisdiction. (*Id.* at 19.) In other words, the United States must show that the wetlands at issue meet the requirements of the *Sackett* two-part test. Defendants then go on to explain that the United States cannot show this. (*Id.* at 20–29.) Because of this failure, Defendants maintain that there is no federal subject matter jurisdiction. (*Id.* at 5.)

Defendants' argument, while creative, is without merit. First, 28 U.S.C. § 1345 gives federal district courts "original jurisdiction of all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345. Thus, the United States is not required to show that federal question jurisdiction exists here because it has independent jurisdiction under 28 U.S.C. § 1345. *See United States v. City of Arcata*, 629 F.3d 986, 990 (9th Cir. 2010); *Peerless Ins. Co. v. United States*, 674 F. Supp. 1202, 1206 (E.D. Va. 1987); *United States v. Am. Druggists' Ins. Co.*, 627 F. Supp. 315, 319 (D. Md. 1985).

Additionally, this Court has federal question jurisdiction over the case. Legislative, or regulatory, jurisdiction and adjudicatory jurisdiction are two (2) fundamentally distinct concepts. *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435 (4th Cir. 1999). The former involves the ability of the government to make its laws applicable to persons or activities, while the latter involves a court's power to resolve disputes. *Id.*

Whether Congress asserted regulatory power over a challenged act is a question of substantive law, rather than a question of the Court's jurisdiction to hear such a cause of

8

action. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting). Generally, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). A statutory requirement or limitation ordinarily does not affect a court's jurisdiction unless Congress has expressly identified it as jurisdictional. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006).

Congress has not expressly identified a subject matter jurisdiction requirement within the CWA. In fact, the definition of navigable waters in the CWA "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *United States v. Sea Bay Dev. Corp.*, 2007 WL 1169188, at *5 (E.D. Va. Apr. 18, 2007) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). The only circumstance in which it appears that a court's subject matter jurisdiction under the CWA may be disturbed is found within the citizen-suit provision, where the United States is not a party. *See* 33 U.S.C. § 1365; *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 609, 612 (D. Md. 2011) (finding that the CWA barred a district court from exercising jurisdiction over a citizen suit when the government has commenced and is "diligently prosecuting" an enforcement action). The citizen-suit provision does not apply here because this suit was brought by the United States.

Defendants rely on *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798 (E.D.N.C. 2014), *amended by* No. 7:13-cv-200-FL, 2014 WL 10991530 (E.D.N.C. Aug. 1, 2014), for their argument that this Court lacks jurisdiction

9

over the United States' CWA claim. (Mem. in Supp. at 5.) However, *Cape Fear* is readily distinguishable. It was not brought by the United States but was instead brought by a private citizen. Thus, 28 U.S.C. § 1345 did not provide an independent jurisdictional basis, as it does here. Additionally, the district court in *Cape Fear* did not address the difference between regulatory jurisdiction and adjudicatory jurisdiction. Instead, it discussed "jurisdiction" broadly and stated in a footnote that "[a]lthough defendant casts its argument . . . as a failure to state a claim, the court examines it together with [another count] as a jurisdictional question pursuant to the CWA." *Id.* at 808 n.10; *see also Steel Co.*, 523 U.S. at 90 ("Jurisdiction" is "a word of many, too many meanings . . . ."). This Court declines to adopt *Cape Fear's* reasoning.

Accordingly, the Court finds that subject matter jurisdiction exists and, thus, denies Defendants' 12(b)(1) motion.

### B. The United States fails to support its claim with sufficient factual allegations.

Defendants assert that the United States fails to state a claim for which relief may be granted because the facts alleged in the Complaint cannot satisfy the two-part *Sackett* test. (Mem. in Supp. at 29.) Defendants advance three (3) primary arguments in support of this claim: (1) the streams on the Site are intermittent and do not qualify as WOTUS; (2) the Site does not connect to any WOTUS; and (3) there is no continuous surface connection to WOTUS. (*Id.* at 29–30.) In developing their arguments, Defendants rely heavily on maps of the Site taken from multiple websites cited in the Complaint.

First, the Court must determine whether it can consider these maps at the motion

to dismiss stage. The United States included three (3) links in its Complaint, each directing to a different mapping website. (Compl. at 5 n.1, 6 n.2, 7 n.3.) These websites include mywaterway.epa.gov (the "My Waterway link"), streamstats.usgs.gov (the "StreamStats link), and apps.nationalmap.gov (the "USGS National Map link"). (*Id.*) The My Waterway link leads to a "Waterbody Report" for the Glen Allen and Ashland area, which indicates that "Lickinghole Creek is classified as 'impaired' for recreation and 'good' for aquatic life." (*Id.* ¶ 32); *see How's My Waterway?*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (last visited Aug. 6, 2024), https://mywaterway.epa.gov/waterbody-report/21VASWCB/VAP-G05R_SNF02A12/2022. The My Waterway link and StreamStats link lead to USGS mapping tools of the United States. *See* USGS (last visited Aug. 6, 2024), https://apps.nationalmap.gov/viewer/; *StreamStats*, USGS (last visited Aug. 6, 2024), https://streamstats.usgs.gov/ss/.

Though it is close, the Court finds that it can consider the contents of these websites when evaluating the Motion for the following reasons. First, though the United States did not attach images of the maps on the websites to the Complaint, it includes such images in its response in opposition and asserts that they provide factual support for the Complaint's allegations. (*See* Resp. in Opp'n at 10–11, 25–28, ECF No. 19; Almeter Decl., ECF No. 19-1.) Next, the links are integral to the Complaint and the authenticity of the websites is not disputed, allowing the Court to consider them. *See Goines*, 822 F.3d at 166. Finally, both parties argue that the Court can consider the content of the websites that these links direct to. (Mem. in Supp. at 6, 7 n.6; Resp. in Opp'n at 18.)

Defendants use the maps and mapping tools available on the USGS'

11

Mywaterways and StreamStats websites to argue that there is no factual basis for the United States' claim. (Mem. in Supp. at 22–29.) However, the Court need not reach the merits of Defendants' arguments because there are factual disputes about what the maps show. Defendants argue that the maps demonstrate that there are no unnamed tributaries that connect to the Site. (*Id.*) For example, Defendants provide the USGS map depicted below to illustrate that there are no bodies of water visible in the Site:



(Defs.' Ex. B at 6, ECF No. 12-2 (outlining the Site in blue).) However, the United States argues that Defendants incorrectly interpret the maps and fail to display the correct layers on the maps. (Resp. in Opp'n at 24.) The United States provides the following map, which is from the same USGS mapping tool as the map provided by Defendants. The difference is that "relevant data layers [are] selected."



(*Id.* at 11 (outlining the Site in red).) The United States' map contradicts Defendants' map and appears to depict a stream or body of water that runs through the Site. The parties also disagree as to whether the hillshade data from the maps demonstrate that unnamed tributaries are present at the Site. (Mem. in Supp. at 25–27; Resp. in Opp'n at 24.) Finally, the parties disagree as to whether the maps show that the segments of Lickinghole Creek and Campbell Creek closest to the Site are intermittent streams that do not qualify as WOTUS. (Mem. in Supp. at 2–3, 8–12, 20–24; Resp. in Opp'n at 20–23, 27.)

At this stage, it is inappropriate for the Court to resolve these factual disputes. This is compounded by the United States' argument that there are facts other than the maps that demonstrate that the wetlands on the Site qualify as WOTUS. (Resp. in Opp'n at 10–11, 26–27.) Defendants essentially ask the Court to determine what the maps show, a question better left for summary judgment. Accordingly, the Court will decline to grant Defendants' Motion on these grounds.

Though the maps are not dispositive at this stage, the United States ultimately fails

13

to adequately plead its CWA claim. The United States describes each wetland as being "adjacent to" and having a "continuous surface connection" with "relatively permanent tributaries" that are connected to "traditional navigable water[s]." (Compl. ¶¶ 30–42.) The United States characterizes these descriptors as facts. (Mem. in Opp'n at 24.) However, these statements are legal conclusions, as they merely recite the language and elements of the *Sackett* test, which reads as follows:

> [a party must] establish first, that the adjacent body of water constitutes "water[s] of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Sackett*, 598 U.S. at 678–79 (quoting *Rapanos*, 547 U.S. at 755) (internal quotations and alterations omitted). Though the Complaint describes the location and names of each of these bodies of water, it alleges no facts to substantiate the conclusions that a "continuous surface connection" exists or that the tributaries are "relatively permanent." The United States' response is telling because it recognizes that the inquiries into "[w]hether the tributaries discussed in the Complaint are 'relatively permanent'" and "whether the affected wetlands abut and have a continuous surface connection to [WOTUS]" are highly fact-sensitive inquiries. (Resp. in Opp'n at 27, 29.) Despite this recognition, the United States fails to provide facts beyond legal conclusions.

The United States provides the links to the mapping websites in its Complaint as evidence of its claims. However, the Complaint only states that the unnamed tributaries are "visible in the [USGS] hillshade elevation data" and that one of the "unnamed tributar[ies] and Campbell Creek are mapped in the Survey's StreamStats online mapping

14

application." (Compl. ¶¶ 35, 41.) The United States does not explain the significance of these maps. It does not discuss how these maps show that a continuous surface connection exists or that the tributaries are relatively permanent. It did not attach images of these maps to the Complaint. Further, the StreamStats link and the USGS National Map link redirect to a generic mapping tool of the entire United States, not a specific map of the Site at issue. A federal district court cannot be expected to sift through a website and use a complex mapping tool in order to determine whether a claim is sufficiently pled—particularly when both parties submit different maps from the same website to the Court.

The United States also argues that it "makes clear that its allegations are premised on [the] EPA's 2021 Site inspection." (Mem. in Opp'n at 24.) However, the Complaint only states that the "EPA conducted an inspection of the Site from April 12, 2021, through April 14, 2021" and that it "identified the presence of aquatic resources discussed above, including wetlands." (Compl. ¶¶ 29, 63.) It provides no details about the results or findings of the inspection. Additionally, though the Complaint states that the inspection "identified the aquatic resources discussed above," those resources were only discussed in terms of legal conclusions. Simply stating that an inspection occurred and identified "wetlands" is not enough to adequately allege that the wetlands in this case are WOTUS.

The United States represents that it can amend the Complaint to include additional detail and asks the Court to dismiss without prejudice and grant it leave to amend if the Court finds the United States' pleading insufficient. (Mem. in Supp. at 28, 28 n.7.) The

15

Court will do so. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.") Accordingly, Defendants' Motion will be granted. The Court will dismiss the United States' Complaint without prejudice and grant it leave to amend.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss. An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: August 15, 2024
Richmond, Virginia